UNITED STATES  DISTRICT COURT

Northern District of California

ERNESTO BAGLIERI,                                    No. C 10-00284 MEJ

                Plaintiff,               **ORDER RE PLAINTIFF'S MOTION**
   v.                                            **FOR PARTIAL SUMMARY**
                                                     **JUDGMENT AND DEFENDANTS'**
CITY AND COUNTY OF SAN                               **AMENDED MOTION FOR PARTIAL**
FRANCISCO; ANGUS CHAMBERS,                           **SUMMARY JUDGMENT**
individually and in his capacity as a police         **(DKT. ## 25, 36)**
officer; and DOES 1-30

                Defendants.
_____/

**I.  INTRODUCTION**

     Before the Court are Plaintiff Ernesto Baglieri's ("Plaintiff") motion for partial summary

judgment (Dkt. #25), and Defendants City and County of San Francisco ("CCSF") and Officer

Angus Chambers (collectively "Defendants") amended motion for partial summary judgment (Dkt.

#36).  The matters came for hearing before the Court on November 18, 2010.  After consideration of

the parties' papers and oral arguments, relevant legal authority, and good cause appearing, the Court

ORDERS as follows.

**II.  BACKGROUND**

     The following facts are not in dispute.  On the evening of September 16, 2009, Chambers

and his partner, Officer Tam were assigned to plainclothes duty in San Francisco's Mission District.

(Defs.' Mot. 2:2-7, Dkt. #36.)[1]  The officers received a lower priority call that there were two

subjects sitting in a black vehicle with white doors, possibly doing drugs, mid-block in the 1100

block of Hampshire Street.  (Pl.'s Mot. 4:3-5:2, Dkt. #25) (citing Geerhart Decl., Ex. A 32:16-22,

80:2-23, Dkt. #25 (hereinafter "Chambers Depo.")).  Three minutes after the call, Chambers and

---

[1]Where the facts are undisputed, the Court will cite to only one party's papers.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   Tam, with Tam behind the wheel of a blue unmarked Ford Crown Victoria police car, were driving

2   slowly down Hampshire between 23rd and 24th Streets. (Chambers Depo. 31:19-24, 35:1-10.) The

3   officers spotted two persons sitting in a white Lexus, parked askew, four buildings from the corner

4   of 24th Street on Hampshire. *Id.* at 39:19-40:21. Plaintiff was sitting in the driver's seat and his

5   then-girlfriend, Allison Cobley, was in the front passenger seat. (Defs.' Mot. 2:13-17, Dkt. #36.)

6   Plaintiff and Cobley were parked facing north in front of 1183 Hampshire Street, Plaintiff's home.

7   (Joint Status Statement ("JSS") 3:5-8, Dkt. #42.) Plaintiff's car was facing the opposite direction of

8   the officers' car, which stopped nearly parallel to the white Lexus, with a lane for traffic between the

9   two. (Chambers Depo. 40:22-41:11.) There was some discussion between the officers and Plaintiff,

10  and then Plaintiff got out of his car. (JSS 3:11-12, Dkt. #42.) The officers immediately got out of

11  their car. *Id.* at 3:13. Chambers withdrew his pistol and pointed it in the direction of Plaintiff and

12  his car. *Id.* at 3:13-14. The officers put Plaintiff in handcuffs and moved him away from his car. *Id.*

13  at 3:14-15. Chambers retrieved Plaintiff's identification from Plaintiff's wallet which was inside his

14  car. *Id.* at 3:15-16. When Plaintiff's identification was confirmed, he was released. *Id.* at 3:16.

15  Plaintiff was not charged with any crime. *Id.* at 3:16-17. Beyond this point, the facts are in dispute.

16        Plaintiff's allegations are as follows. While in his car, Plaintiff noticed a blue car with its

17  headlights off driving slowly down the street. (Pl.'s Opp'n 8:4-5, Dkt. #44) (citing Plaintiff's

18  Deposition). Plaintiff was frightened because he thought it might be a drive-by shooting. *Id.* at 8:5-

19  6. The car stopped slightly in front of Plaintiff's car and Plaintiff turned off his interior lights and

20  shut off his car. (Geerhart Decl., Ex. C 46:18-48:20, Dkt. #45 (hereinafter "Pl.'s Depo.")). The

21  driver's side window of the officer's car was down, and when the officers pulled up, the driver

22  (Tam) said to Plaintiff "[l]ooks like you're a little bit close to that car behind you." (Pl.'s Depo.

23  49:14-50:5.) Plaintiff informed them that it was his father's car. *Id.* at 50:9. At this time, Plaintiff

24  was a bit frightened, as the officers were in plainclothes and had not yet identified themselves. *Id.* at

25  50:10-16. Tam asked Plaintiff who owned the car he was in, and Plaintiff informed him that he did;

26  in response to further questioning, Plaintiff told Tam that the surrounding cars belonged to his father

27  and brother and that he lived in the house in front of which they were parked. *Id.* at 51:1-15. Next,

28

Plaintiff became offended by something Tam asked him, and Plaintiff responded "[w]ho the hell are you?" *Id.* at 51:17-53:2. Tam responded by saying something akin to "it doesn't matter," and putting the Crown Victoria in park. *Id.* at 53:3-17.

At this point, Plaintiff stepped directly out of his car and again asked the officers "who the hell" they were. *Id.* at 53:18-55:7. The officers did not respond. *Id.* at 55:8-11. Plaintiff adjusted his stance, taking half a step toward the Crown Victoria, at which point Chambers jumped out of the passenger seat, alerting Plaintiff for the first time to the presence of two individuals in the Crown Victoria. *Id.* at 55:13-55:13. Chambers was wearing a black shirt as he came around the front of the car, pulled out his gun, and pointed it at Plaintiff's face. *Id.* at 57:3-59:12. Chambers told Plaintiff to put his hands up, but did not identify himself as SFPD. *Id.* at 60:2-7. Plaintiff put his hands up. *Id.* at 60:11:12. Chambers reached for one of Plaintiff's hands, which were above his head, then turned Plaintiff around. *Id.* at 61:8-62:10. During this encounter, Plaintiff recalls that the pistol was 5 or 6 inches from his face. *Id.* at 62:10-20. Chambers then used one hand to pat Plaintiff down, then pulled Plaintiff's hands behind his back and handcuffed him; he said something to Plaintiff, but Plaintiff does not recall whether it was during or after he was handcuffed. *Id.* at 63:18-65:8. When Chambers grabbed Plaintiff's hands and initiated the above sequence of events, he told Plaintiff to stop resisting, to stop resisting arrest, and finally, identified himself as SFPD. *Id.* at 65:17-66:16. Plaintiff denies resisting arrest. *Id.* at 66:16-20. Plaintiff testified that after Chambers turned him around, he shoved Plaintiff against his own car and pressed his gun against the back of Plaintiff's head; Plaintiff could feel the cold tip of the barrel. *Id.* at 68:6-21. Plaintiff felt the gun against his head during the entire encounter; he testified that it lasted between 5 and 7 minutes. *Id.* at 73:23-74:2. Plaintiff became aware that Tam was standing behind the Lexus when he heard him say "hey buddy, you need to calm down." *Id.* at 71:25-72:20. Then Chambers asked Plaintiff if he wanted to die or go to jail. *Id.* at 72:24-73:1. In response, Plaintiff told Chambers that he was a rookie. *Id.* at 74:21-25.

Plaintiff was moved over to the Crown Victoria while handcuffed; he sat on the front bumper. *Id.* at 85:6-24. At that time, three or four uniformed officers had arrived on the scene. *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1  at 89:5-9.  While he was sitting on the front bumper, the officers asked Plaintiff his name, and he

2  told them; they asked him where his identification ("ID") was, and he said it was in the car.  *Id.* at

3  93:25-94:4.  Plaintiff testified that his wallet was in his glove box and he saw someone, he doesn't

4  recall who, retrieve it from his car.  *Id.* at 95:2-15.  The officers did not ask Plaintiff if they could

5  retrieve his wallet from his car.  *Id.* at 94:25-95:2.  Later, Tam removed Plaintiff's handcuffs.  *Id.* at

6  98:11-12.

7          Defendants' recitation of the facts is as follows.  Because Plaintiff's vehicle matched the

8  reported number of occupants, partially matched the color scheme, and was in the approximate

9  location of the tip, the officers decided to investigate.  (Defs.' Mot. 2:18-19, Dkt. #36.)  Although

10  unmarked, the Crown Victoria was easily identifiable as a police car.  *Id.* at 2:21.  While still in the

11  car, either Tam or Chambers said to Plaintiff "[h]ey, SFPD.  We want to talk to you."  (Chambers

12  Depo. 45:11-15.)  Plaintiff became more and more agitated, so Tam instructed Plaintiff to remain in

13  his car.  *Id.* at 47:3-8.  At this point, Chambers testified that Plaintiff was detained, based on the

14  instruction to remain in his car.  *Id.* at 47:23-48:1.  The detention was based on the officers' beliefs

15  that Plaintiff may have been the one the narcotics tip was in regards to.  *Id.* at 48:2-9.  After Tam

16  instructed Plaintiff to remain in his car, Plaintiff immediately popped his trunk and exited his car,

17  almost simultaneously.  *Id.* at 48:10-22.  Plaintiff began moving toward his open trunk, and the

18  officers exited the police car.  *Id.* at 49:1-5.  As Chambers was exiting the car, he clipped his badge

19  on the neck of his shirt.  *Id.* at 49:7-12.  Both officers then told Plaintiff to get back in his car, to

20  which he responded "[w]hat?  I'm not doing anything."  *Id.* at 49:14-19.  Based upon Chambers'

21  perception of Plaintiff's actions — his agitation at the contact, getting out of the car after being

22  ordered to stay in the car, and moving toward his trunk — Chambers had his weapon drawn as he

23  exited the car.  *Id.* at 50:8-51:23.  Tam reached Plaintiff before Chambers did, and Chambers

24  holstered his weapon; Chambers testified that he would not have approached Plaintiff with his

25  weapon drawn for safety reasons.  *Id.* at 54:8-15.  The officers restrained Plaintiff to keep him from

26  reaching his trunk.  *Id.* at 54:22-55:4.  The officers told Plaintiff to put his hands behind his back,

27  and he said he would not because there was no reason to.  *Id.* at 55:6-9.  Each officer grabbed one of

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   Plaintiff's hands and they forcibly handcuffed him. *Id.* at 55:10-15. While they were attempting to

2   handcuff him, Plaintiff struggled for a matter of seconds by "flexing his arms to make it difficult"

3   for the officers to handcuff him. *Id.* at 56:1-9. Chambers testified that his weapon was drawn for

4   less than 30 seconds. *Id.* at 56:20-57:5. The weapon was pointed straight at Plaintiff and his car.

5   *Id.*

6           After detaining Plaintiff by placing him in handcuffs and walking him over to the police car,

7   Chambers asked him for his ID. *Id.* at 57:12-18, 60:19-21. Plaintiff responded that his ID was in his

8   car. *Id.* at 60:22-23. Chambers testified that one of them watched Plaintiff while the other went into

9   Plaintiff's car and found his wallet, somewhere in the center console. *Id.* at 61:1-16. After locating

10  Plaintiff's ID inside his wallet, the officers ran a records inquiry and determined that he had no

11  outstanding warrants. *Id.* at 62:3-12. Chambers then approached Plaintiff — still in handcuffs and

12  sitting on or standing in front of the police car — and explained to him that the officers contacted

13  him based on a tip they'd received and that they placed him in handcuffs because they didn't feel

14  safe with the way Plaintiff was acting towards them. *Id.* at 62:23-63:7. During or directly after this

15  conversation, Chambers removed the handcuffs. *Id.* From the time the officers arrived on the scene

16  until they released Plaintiff from handcuffs was less than 15 minutes. (Defs.' Mot. 3:15-16, Dkt.

17  #36.)

18          Plaintiff filed his initial complaint in this case on January 21, 2010. (Dkt. #1.) On July 9,

19  2010, he filed a First Amended Complaint ("FAC"), alleging ten causes of action: (1) violation of 42

20  U.S.C. § 1983 against Chambers; (2) a *Monell* claim against CCSF; (3) violation of 42 U.S.C. §

21  1981 against Chambers; (4) violation of California Civil Code section 51.7 against Chambers; (5)

22  Assault and Battery against Chambers; (6) Intentional Infliction of Emotional Distress against

23  Chambers; (7) Negligence against Chambers; (8) Negligent Selection, Training, Retention,

24  Supervision, Investigation, and Discipline against CCSF; (9) Respondeat Superior against CCSF;

25  and (10) violation of California Civil Code section 52.1 against all Defendants. (Dkt. #24.)

26          On August 30, 2010, Plaintiff filed his motion for partial summary judgment. (Dkt. #25.)

27  Defendants filed an opposition on September 21, 2010 (Dkt. #30), and on September 27, 2010,

28

5

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Plaintiff filed a reply (Dkt. #39).

2        On September 22, 2010, Defendants filed their motion for partial summary judgment.  (Dkt.

3    #36.)  Plaintiff filed an opposition on October 26, 2010 (Dkt. #44), and on November 4, 2010,

4    Defendants filed a reply (Dkt. #48).

5                                **III.  DISCUSSION**

6        In his motion, Plaintiff argues that summary judgment is proper as to his first cause of action,

7    claiming that Chambers violated his Fourth Amendment rights as a matter of law when he pointed a

8    loaded gun at him, handcuffed and detained him, and searched Plaintiff's car without a warrant.

9    (Pl.'s Mot. 3:12-17, Dkt. #25.)

10       Defendants, in response, argue that Plaintiff's arguments ignore the "objectively reasonable

11   perception of a threat to officer safety" posed by Plaintiff's own conduct.  (Defs. Opp'n 1:15-17,

12   Dkt. #30.)  Defendants contend that Plaintiff's conduct created special circumstances which made

13   his detention one where drawing weapons and using handcuffs did not violate the Fourth

14   Amendment.  *Id.* at 1:17-19.  Defendants maintain that even had Plaintiff's Fourth Amendment

15   rights been violated, summary judgment in Plaintiff's favor is inappropriate because Chambers is

16   entitled to qualified immunity for his actions.  *Id.* at 1:19-22.

17       Similarly, in their motion, Defendants argue that Chambers' detention of Plaintiff and search

18   for his ID were not constitutional violations.  (Defs.' Mot. 1:20-21, Dkt. #36.)  Even if they were

19   constitutional violations, Defendants reason Chambers is entitled to qualified immunity.  *Id.* at 1:21-

20   22.  Thus, Defendants contend, they are entitled to partial summary judgment on each of Plaintiff's

21   ten causes of action.  *Id.* at 1:24-25.  Defendants state that they have not moved for summary

22   judgment on what would be Plaintiff's remaining claims if their motion is granted in its entirety —

23   an allegation of excessive force in violation of 42 U.S.C. § 1983 against Chambers and an allegation

24   of *Monell* liability for the same conduct — as a factual dispute exists regarding the use of force by

25   Chambers while Plaintiff was handcuffed.  *Id.* at fn.1.

26       In response, Plaintiff argues that the officers did not have the grounds to have anything more

27   than a consensual contact with Plaintiff, yet Plaintiff had a loaded gun pointed at his head, was

28

1   handcuffed, and had his car searched, all in violation of his Fourth Amendment rights.  (Pl.'s Opp'n

2   2:18-3:4, Dkt. #44.)  Accordingly, Plaintiff contends that Defendants' motion must be denied.  *Id.*

3   **A.      Legal Standard**

4           Federal Rule of Civil Procedure 56(c) of the Federal Rules of Civil Procedure authorizes

5   summary judgment if there is no genuine issue as to any material fact and the moving party is

6   entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

7   (1986).  An issue of fact is "material" if, under the substantive law of the case, resolution of the

8   factual dispute might affect the outcome of the case.  *Id.* at 248.  A dispute over a material fact is

9   "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

10  party."  *Id.* at 249.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence

11  from which a reasonable jury, viewing the evidence in the light most favorable to that party, could

12  resolve the material issue in his or her favor.  *Id.*  However, "[i]f the evidence is merely colorable, or

13  is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations

14  omitted).

15          The moving party bears the initial burden of demonstrating the basis for the motion and

16  identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and

17  admissions on file that establish the absence of a triable issue of material fact.  *Celotex Corp. v.*

18  *Catrett*, 477 U.S. 317, 323 (1986).  When the nonmoving party has the burden of proof at trial, the

19  moving party need only point out "that there is an absence of evidence to support the nonmoving

20  party's case."  *Id.* at 325.  If the moving party meets this initial burden, the burden then shifts to the

21  non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R.

22  Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

23  574, 586-87 (1986).  If the non-moving party fails to establish the existence of an element essential

24  to its case, and on which that party will bear the burden of proof at trial, the moving party is entitled

25  to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.  The non-movant's bare assertions,

26  standing alone, are insufficient to create a genuine dispute as to a material fact and defeat a motion

27  for summary judgment.  *Anderson*, 477 U.S. at 248-49.  Rather, the non-moving party has the

28

UNITED STATES DISTRICT COURT
For the Northern District of California

7

burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). "General references without page or line numbers are not sufficiently specific." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan*, 91 F.3d at 1279; *see Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). In ruling on a motion for summary judgment, any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587.

**B.     Whether Chambers Entitled to Qualified Immunity**

In his motion, Plaintiff argues that Defendants violated his Fourth Amendment rights as a matter of law in several respects. Plaintiff first claims that, in the Ninth Circuit, there is a clearly established violation of the Fourth Amendment where an officer points a loaded gun at a person in the absence of a present threat. (Pl.'s Mot. 8:20-9:8, 10:2-15, 12:25-13:1, Dkt. #25.) Next, Plaintiff claims that the detention itself was unlawful because Chambers did not "possess[ ] articulable facts giving rise to reasonable suspicion that Plaintiff had committed a crime at the time of the initial detention." *Id* at 14:3-17. Finally, Plaintiff contends that there was no probable cause to search his vehicle for his ID, that he never consented to a search, and thus that the search was per se unlawful. *Id.* at 15:9-16.

In response, Defendants argue that, even if Plaintiff could establish that they violated his Fourth Amendment rights, Chambers is entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity will protect an accused official regardless of whether the error

is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.*
(citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  Accordingly, even when a plaintiff has alleged
facts which make out a constitutional violation, qualified immunity will protect the governmental
official alleged to have committed the violation unless the official's conduct violated a clearly
established constitutional right.  *Id.* at 815-16.

Courts must make two determinations in the qualified immunity analysis.  First, the court is
tasked with determining whether the governmental official's conduct violated the plaintiff's
constitutional rights, viewing the facts in the light most favorable to the plaintiff.  *Saucier v. Katz*,
533 U.S. 194, 201 (2001).  The next step is to determine whether the violated right was one "clearly
established," meaning that "[t]he contours of the right [are] sufficiently clear [such] that a reasonable
official would understand that what he is doing violates that right."  *Id.* at 201-02 (internal citations
omitted).  "The relevant, dispositive inquiry in determining whether a right is clearly established is
whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he
confronted."  *Id.* at 202.  Even unpublished decisions of district courts may guide this analysis.
*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003).
Accordingly, "[i]f the law did not put the officer on notice that his conduct would be clearly
unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 503 U.S. at
202.    In *Pearson*, the Supreme Court held that lower court judges may "exercise their sound
discretion in deciding which of the two prongs of the qualified immunity analysis should be
addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 129 S.Ct. at
817-18.  This deference to the discretion of lower court judges advances the purposes of the
qualified immunity doctrine by allowing courts to dispose of cases more readily.  *Id.* at 818.
However, the Court is still permitted to engage in the *Saucier* two-step analysis where it proves
beneficial.   *Id.*  There are instances "in which there would be little if any conservation of judicial
resources to be had by beginning and ending with a discussion of the clearly established prong."  *Id.*
"It often may be difficult to decide whether a right is clearly established without deciding precisely
what the constitutional right happens to be."  *Id.*  (internal citations and quotations omitted).

9

Where federal courts are in disagreement on a particular subject, it cannot be said that the law on that subject is "clearly established." *Pearson*, 129 S.Ct. at 823.  Accordingly, the issue before the Court is whether applicable Fourth Amendment law is so clearly established that Chambers could not have reasonably believed that his conduct — detaining Plaintiff, pointing his loaded weapon at Plaintiff, and searching Plaintiff's car for his ID — was lawful.  *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  In determining whether the law is clearly established, the framing of the legal rule at issue is key.  *Id.* at 639.  The Supreme Court explained:

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.  Much the same could be said of any other constitutional or statutory violation.  But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*.

*Id.*  The reason behind the rule is that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right[,]" meaning that the unlawfulness of the official's actions must be apparent to him or her in light of pre-existing law.  *Id.* The Court will address in turn each right Plaintiff claims was violated.

In the Ninth Circuit, "in an excessive force case like this one, [the Court] must ask first whether the facts taken in the light most favorable to the plaintiff would establish a violation of the Fourth Amendment.  Only if the answer is in the affirmative should [the Court] address the immunity issue. The immunity inquiry then focuses on whether the law was clearly established at the time."  *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002).  Accordingly, the Court must analyze the facts as pled by Plaintiff to determine whether he has alleged a Fourth Amendment violation, and whether the law was so clearly established that a reasonable officer would have known that his conduct violated the law.

1.    The Detention

As discussed above, Chambers concedes that Plaintiff was detained early in the encounter, when Tam told Plaintiff to stay in his car.  (Chambers Depo. 47:23-48:1.)  Defendants contend that even if the detention lacked reasonable suspicion and was therefore unconstitutional, Chambers is

UNITED STATES DISTRICT COURT
For the Northern District of California

1   entitled to qualified immunity from suit because it would not have been clear to him or a reasonable

2   officer that such conduct was unlawful.  (Defs.' Mot. 13:15-17, Dkt. #36.)

3          In response, Plaintiff contends that Chambers did not have the requisite reasonable suspicion

4   to conduct a *Terry* stop of "the driver of the wrong car at the wrong spot on the block."  (Pl.'s Opp'n

5   2:19-21, Dkt. #44.)  Plaintiff argues that, because there was no reasonable suspicion, the officers

6   violated his rights by detaining him after he told them to leave him alone.  *Id.* at 13:10-14:2.

7   However, Plaintiff fails to respond to Defendants' qualified immunity argument as to this particular

8   allegation.

9          To determine whether an investigatory detention is reasonable, courts must look at the

10  totality of the circumstances and "[b]ased upon that whole picture the detaining officers must have a

11  particularized and objective basis for suspecting the particular person stopped of criminal activity."

12  *U.S. v. Cortez*, 449 U.S. 411, 417-18 (1981).  In looking at the totality of the circumstances

13  presented, officers must rely on inferences and deductions made possible by their training, and only

14  when those inferences and deductions yield a particularized suspicion that the individual in question

15  is or may engage in criminal activity does "reasonable suspicion" exist.  *Id.* at 418.

16         Defendants contend that the totality of circumstances leading to Plaintiff's detention raised a

17  particularized suspicion that Plaintiff might be engaged in criminal activity.  (Defs.' Mot. 5:4-13,

18  Dkt. #5.)  The totality of circumstances, Defendants argue, were as follows.  First, Defendants had a

19  fresh tip that two subjects sitting in a black vehicle with white doors, possibly doing drugs, were

20  parked mid-block in the 1100 block of Hampshire Street.  (*Id.*; Chambers Depo. 32:16-22, 80:2-23.)

21  Defendants maintain that even though Plaintiff's white Lexus did not match the exact description

22  called in, the car matched the reported number of occupants, the approximate location, and the color

23  scheme of the car partially matched the report.  (Defs.' Mot. 2:17-18, 5:7-9, Dkt. #36.)  Defendants

24  contend that the tip, coupled with the fact that there were no other occupied cars on the block,

25  justified the stop.  *Id.* at 5:9-13.  Defendants further argue that the incident occurred in a "high crime

26  area where drug use and drug sales were common . . . ."  *Id.* at 5:7.  "An individual's presence in an

27  area of expected criminal activity, standing alone, is not enough to support a reasonable,

28

11

1  particularized suspicion that the person is committing a crime.  But officers are not required to

2  ignore the relevant characteristics of a location in determining whether the circumstances are

3  sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124

4  (2000).  Defendants argue that it was reasonable for the officers to stop and investigate based on

5  these facts.  (Defs.' Mot. 5:12-13, Dkt. #36.)  Here, while the tip did not identified a black vehicle

6  with white doors, as opposed to Plaintiff's white vehicle, Chambers testified that officers take tips as

7  a guideline, rather than as a strict rule for whom to stop:

> Overwhelmingly, the amount of information we get from people who call into the
> police is often incorrect.  We often get bad descriptions of people's clothing or
> vehicles.  Misdescribe [sic] makes, models, et cetera, colors.  So [we take the]
> information we see on the screen, we take it as a sort of guideline for where to look
> and what to look for, but if . . . we're responding to a shooting call of a male wearing
> a, you know, black jacket, blue jeans and we see a guy who looks similar but is
> wearing a brown jacket, we're still going to stop him.

12  (Chambers Depo. 83:20-84:7.)

13        Defendants further argue that the detention did not occur until following the initial verbal

14  contact with Plaintiff.  (Def.'s Mot. 5:14-19, Dkt. #36.)  Defendants maintain it was "Plaintiff's

15  belligerent responses to the officer's inquiries and his increasingly agitated state [which] heightened

16  the officer's reasonable suspicion," and only then did the officers instruct Plaintiff to remain in his

17  car. *Id.*  Chambers testified that they pulled up and initiated a conversation with Plaintiff and that

18  before they exited the cars, the officers identified themselves as SFPD.  (Chambers Depo. 42:17-

19  45:15.)  Chambers also testified that Plaintiff seemed to be getting agitated that the officers wanted

20  to talk to him and that they weren't leaving, at which point Tam told Plaintiff to stay in his car. *Id.*

21  at 47:3-8.  Defendants concede that it was at this moment that the encounter became an investigatory

22  detention.  (Defs.' Mot. 5:16-17, Dkt. #36.)  However, Chambers also testified that, based on the tip

23  and the fact that Plaintiff and his girlfriend were the only people the officers saw occupying a parked

24  car on the street, he believed there was a "good chance" that there was narcotic use taking place in

25  the vehicle.  (Chambers Depo. 52:3-53:11.)

26        Accordingly, viewing the facts in a light most favorable to Plaintiff, the Court must

27  determine whether there was reasonable suspicion to detain Plaintiff on the anonymous tip coupled

28

UNITED STATES DISTRICT COURT
For the Northern District of California

with the location being considered a high crime area and the other circumstances offered by Defendants.

"In certain circumstances, an anonymous tip can serve as the basis for reasonable suspicion." *U.S. v. Morales*, 252 F.3d 1070, 1074 (9th Cir. 2001) (citing *Alabama v. White*, 496 U.S. 325, 327-28, (1990)); *Illinois v. Gates*, 462 U.S. 213, 233 (1983) (anonymous tip sufficient where independent investigation of officer corroborated nearly every detail given by tipster). However, the Supreme Court requires something more than a generalized anonymous tip to establish reasonable suspicion that criminal activity is afoot. *Morales*, 252 F.3d at 1074. "[I]n order for an anonymous tip to serve as the basis for reasonable suspicion: (1) the tip must include a range of details; (2) the tip cannot simply describe easily observed facts and conditions, but must predict the suspect's future movements; and (3) the future movements must be corroborated by independent police observation." *Id.* at 1076 (internal citations omitted).

More often than not, a tip alone is not enough to amount to reasonable suspicion. In *U.S. v. Reyes*, 225 Fed. Appx. 699, 700 (9th Cir. 2007), the officer received an anonymous tip that a man by the name of Ray Regis was selling drugs at the boat harbor out of a white vehicle with a license plate of KPC 207. The officer arrived at the boat harbor, spotted the car, and next to it, there was a vehicle parked facing the opposite direction, presumably to facilitate conversation between the two drivers. *Id.* The officer did not witness anything but conversation passing between the two drivers; however, he immediately exited his vehicle, ordered "Ray," the driver of the identified car, to place his hands on the steering wheel, and told the occupants of the other car to leave. *Id.* The Ninth Circuit determined that a detention occurred at this moment and found that it was an illegal detention because the anonymous tip, coupled with the manner in which the cars were parked, was not sufficient to raise reasonable suspicion. *Id.* at 701. The court also held that the manner in which the cars were parked was not information sufficient to corroborate the tip. *Id.*

Further, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Loharsingh v. City and County of San Francisco*, 696 F. Supp. 2d 1080, 1097 (N.D. Cal.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    2010) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).  "In cases where the court has relied on

2    an individual's presence in an area of criminal activity, it has been combined with other facts

3    supporting the existence of reasonable suspicion.  Evasive behavior, furtive movements, and

4    suspicious eye contact are all relevant factors in evaluating whether the totality of the circumstances

5    supports reasonable suspicion."  *Id.* (internal citations omitted).

6            The question thus becomes whether Plaintiff's presence in a parked car which did not match

7    the tip coupled with his presence in a high crime area was sufficient to arouse reasonable suspicion

8    that he was engaged in criminal activity.  *U.S. v. Alvarez*, 899 F.2d 833, 837 (9th Cir. 1990).  Here,

9    it is impossible for the officers to have corroborated the tip just by virtue of seeing Plaintiff and his

10   girlfriend sitting in their car because the car did not match the car in the tip.  Further, Chambers did

11   not detect the odor of marijuana or witness any other drug-related activity taking place.

12   Accordingly, it appears that an uncorroborated tip, coupled with Plaintiff's presence in a high crime

13   area, is not enough to support the suspicion that he had or was about to commit a crime.   Thus, the

14   Court finds that there was not reasonable suspicion to detain Plaintiff and that Defendants violated

15   Plaintiff's Fourth Amendment right to be free from detention absent reasonable suspicion.

16           Next, the Court is tasked with determining whether the right violated — detention absent

17   reasonable suspicion — is one clearly established, meaning that "[t]he contours of the right [are]

18   sufficiently clear [such] that a reasonable official would understand that what he is doing violates

19   that right."  *Saucier*, 533 U.S. at 201-02 (internal citations omitted).  As discussed, Defendants argue

20   that the totality of circumstances — the tip, arrival within a few minutes of the tip, Plaintiff and his

21   girlfriend being the only occupants of a parked car on the block, and the location being in a high

22   crime area[2] — justified the detention.  (Defs.' Mot. 5:7-13, Dkt. #36.)  The totality of the

23   circumstances present here were, at best, an uncorroborated tip and Plaintiff's presence in a high

24   crime area.  While the Court is not aware of a case that says an anonymous tip coupled with the

25

26   _____

27           [2]The Court at this point is not considering Defendants' argument that Plaintiff's response to
     questioning gave rise to reasonable suspicion, as the Court must view the facts in the light most
28   favorable to Plaintiff, i.e. using Plaintiff's version of the facts.

14

1    presence in a high crime area would not amount to reasonable suspicion, it cannot state that the law

2    governing the totality of the circumstances inquiry in reasonable suspicion cases is so clear that

3    Chambers should have known he did not have reasonable suspicion to detain Plaintiff.  Where "the

4    law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment

5    based on qualified immunity is appropriate."  *Saucier*, 503 U.S. at 202.  Accordingly, the Court finds

6    that Defendants are entitled to qualified immunity as to the initial detention only and the Court thus

7    GRANTS summary judgment to Defendants on qualified immunity grounds as to the initial

8    detention.[3]

9              2.     Use of Weapon and Handcuffs

10          Next, Defendants contend that if the Court were to find that Chambers' use of his handgun

11   and handcuffs amounted to a Fourth Amendment violation, Chambers is entitled to qualified

12   immunity because it would not have been clear to a reasonable officer that such conduct was

13   unlawful.  (Defs.' Opp'n 18:17-19, Dkt. #30.)  Specifically, Defendants argue that Plaintiff's actions

14   of popping open his trunk and exiting the car after being ordered to remain in the car amounted to

15   aggressive defiance of an officer's directive and would make the reasonable officer concerned for

16   his or her safety.  (Defs.' Mot. 15:6-9, Dkt. #36.)  Defendants maintain that Chambers drew his

17   weapon anticipating that the threat posed by Plaintiff's defiance and aggression could become a

18   deadly threat if Plaintiff made it to his trunk.  *Id.* at 15:9-13.

19          Plaintiff vigorously disagrees.  Plaintiff argues that Ninth Circuit law makes clear that

20   pointing a gun at and/or handcuffing a subject during an investigative stop such as this one is a

21   Fourth Amendment violation, such that a reasonable officer should have known his conduct was

22   illegal.  (Pl.'s Reply 8:19-22, Dkt. #39.)  Plaintiff contends that not only did Chambers point a gun at

23   him, but that he held it close to his face and pressed it against the back of Plaintiff's skull, even

24   while he was handcuffed.  (Pl.'s Opp'n 14:18-19, Dkt. #44.)  Plaintiff maintains that, in the absence

25   of any present threat, police officers may not hold a person at gunpoint.  *Id.* at 16:12-14.

26   _____

27          [3]This finding renders moot Plaintiff's motion for summary judgment, as do the Court's
     findings as to Defendants' motion throughout this Order.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Defendants seek qualified immunity as to Chambers drawing his gun at the outset of the

2    encounter, not what he later did with his gun, based on the material factual dispute about what

3    Chambers did with his gun after he initially drew his gun from his holster while approaching

4    Plaintiff. (Defs.' Reply 1:5-2:1, Dkt. #48.)  However, based on the different versions of facts

5    presented by the parties, the Court is unable to determine whether it was reasonable for Chambers to

6    have his gun drawn initially.  Accordingly, based on the existence of disputed material facts, the

7    Court DENIES Defendants' motion for summary judgment as to the use of the weapon as well as the

8    use of handcuffs.

9         3.    Search for Plaintiff's ID

10    Finally, Defendants argue that retrieving Plaintiff's wallet and ID from his vehicle was not

11    an unconstitutional search. (Defs.' Mot. 9:7-25, Dkt. #36.)  Defendants maintain that because

12    Plaintiff was handcuffed and could not produce his own identification, it was reasonable for the

13    officers to retrieve it out of his vehicle.  *Id.* at 10:8-18.  Defendants further argue that when Plaintiff

14    stated that his ID was in his car, they reasonably construed that as consent to retrieve it.  *Id.*  Further,

15    Defendants contend that "[b]ecause the law is unsettled with respect to the extent that a police

16    officer may compel a detainee to produce identification, a reasonable officer would not be clear that

17    searching for identification was unlawful.  As such, Officer Chambers is entitled to qualified

18    immunity."  *Id.* at 17:3-5.

19    Alternatively, Defendants contend that the detention did not become an arrest because of the

20    use of the weapon and the handcuffs, or because of the length of the detention.  (Defs.' Opp'n 7:27-

21    8:21, Dkt. #30.)  However, they argue that probable cause to arrest did exist under California Penal

22    Code section 148 because when Plaintiff ignored the officers' directive to stay in his car, he was

23    obstructing an investigation.  *Id.* at 9:3-19.  Defendants contend that they could have arrested

24    Plaintiff, and thus that probable cause existed to search Plaintiff's car for his ID.  *Id.*

25    In response, Plaintiff argues that the officers had no right to search his car for his ID absent

26    probable cause.  (Pl.'s Opp'n 8:12-13, Dkt. #39.)  Plaintiff argues that the detention converted into

27    an illegal arrest based upon the use of the gun and handcuffs, and that there was no exception to the

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

16

warrant requirement present which would have enabled officers to lawfully search his vehicle.  *Id.* at

6:11-7:7.  Plaintiff contends that the search of his car was a Fourth Amendment violation of which

any reasonable officer should have known; thus, Chambers is not entitled to qualified immunity.  *Id.*

at 8:20-23.   At the November 18, 2010 hearing, counsel for Plaintiff again argued that the issue is

whether there was probable cause to search Plaintiff's vehicle.

In responding to Plaintiff's arguments, counsel for Defendants asserted that this was not a

search, but was simply a retrieval of Plaintiff's ID and was at the very least reasonable for qualified

immunity purposes based upon Plaintiff's implied consent to retrieve his ID.  Defendants made a

point at the hearing to focus the Court on the issue of whether a person is required to produce ID

during the course of an investigatory detention or during a vehicle stop.  Accordingly, the Court will

first address that issue.

Defendants maintain that a person being detained by law enforcement has an obligation to

disclose his or her identity, noting that the Ninth Circuit has not addressed whether the Fourth

Amendment permits an actual search for ID during an investigatory detention.  (Defs.' Mot. 16:4-7,

Dkt. #36.)  In fact, the law Defendants refer to only supports the proposition that officers have the

right to obtain a suspect's name during the course of a *Terry* stop, in order to determine whether that

person is wanted or otherwise dangerous.  *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S.

177, 186 (2004).  In *Hiibel*, the Supreme Court notes that checking the identity of a detainee is

appropriate, but does not imply that retrieving that suspect's ID from his or her vehicle without

consent is appropriate.  *Id.* (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)).  Regarding

the facts present in the instant case, the Ninth Circuit has not yet determined whether an officer may

forcibly search for ID during an investigatory stop.  *U.S. v. Diaz-Castaneda*, 494 F.3d 1146, 1153

n.1 (9th Cir. 2007) ("We do not address here the different factual circumstance of a police officer

*improperly* obtaining a person's driver's license or state ID card and then running a check of the

document.").

Defendants cite to a case in the Seventh Circuit in which the court held that forcible removal

and search of an individual's briefcase for his identification was appropriate during the course of a

17

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  *Terry* stop where the purported detainee refused to provide officers with ID.  *Cady v. Sheahan*, 467

2  F.3d 1057, 1059-60, 1063 (7th Cir. 2006).  However, that case is distinguishable because there, the

3  detainee was refusing to produce his ID during the course of a lawful investigatory detention.  *Id.* at

4  1062-63.  In this case, Plaintiff was never asked to physically retrieve his ID.  Officers asked

5  Plaintiff for his ID while he was handcuffed, he answered that it was in his car, and either Chambers

6  or Tan entered his car and retrieved Plaintiff's wallet.  (Chambers Depo. 57:12-18, 60:19-23, 61:1-

7  16, 62:3-12.)

8  Defendants also cite to *U.S. v. Villagrana-Flores*, 467 F.3d 1269 (10th Cir. 2006).  However,

9  *Villagrana-Flores* tends to support Plaintiff's argument that officers were not justified in retrieving

10  his ID, holding that if a "request for identification comes after an officer stops an individual for

11  investigative purposes, the Fourth Amendment requires the initial stop to have been based on

12  reasonable suspicion."  *Id.* at 1275 (citing *Brown v. Texas*, 443 U.S. 47, 51-52 (1979).  The proper

13  inquiry is whether officers had probable cause to retrieve Plaintiff's ID from his car.  As set forth

14  above, although Chambers is entitled to qualified immunity for the detention, it is not clear that an

15  anonymous tip coupled with the presence in a high crime area amounts to reasonable suspicion.

16  Thus, viewing the facts in the light most favorable to Plaintiff, his right to be free from an

17  unreasonable search — a warrantless one without probable cause — may have been violated when

18  officers retrieved Plaintiff's ID from his car without his consent.  *Saucier*, 533 U.S. at 201.

19  Assuming this to be true, the Court must determine whether this right is one so clearly

20  established that a reasonable officer would have known that he was violating Plaintiff's Fourth

21  Amendment rights.  *Id.* at 202.  Here, Defendants argue that the law is not settled as to the extent

22  that a police officer may compel a detainee to produce ID, and thus a reasonable officer would not

23  be clear that his conduct on this set of facts was unlawful.  (Defs.' Mot. 17:3-5, Dkt. #36.)  In

24  response, Plaintiff contends that there was no possible exception to the warrant requirement present

25  which would allow Defendants to legally search his vehicle, and thus the search of his car for his ID

26  was presumptively illegal.  (Pl.'s Opp'n 19:7-15, Dkt. #44.)

27  Defendants' argument assumes a lawful investigatory detention, and, as discussed above, it is

28

UNITED STATES DISTRICT COURT
For the Northern District of California

not clear that Plaintiff's detention was such based on his version of the facts.  Accordingly, the issue

is whether the law with respect to warrantless vehicle searches is so clear that officers reasonably

should have known they were violating Plaintiff's rights.  Both parties agree that Chambers did not

have consent to search Plaintiff's car.  (Pl.'s Opp'n 19:25-20:5, Dkt. #44; Chambers Depo. 63:21-

64:25.)  In fact, in his deposition, Chambers admits that there was not probable cause to search the

vehicle:

> Q: Well, why didn't you ask him for consent to search the car?  A: I didn't believe he
> would give us consent based on how upset he was that we had stopped and talked to
> him.  Q: What would you have needed, I'm talking about in terms of your officer
> training, in order to just go ahead and do a search of the car without his consent?  A:
> If we had probable cause to search — if I had walked over to his car and seen a big
> bag of marijuana or cocaine sitting on his front seat, that would give me a reason to.

(Chambers Depo. 64:8-19.)  Granted, Defendants maintain that the retrieval of Plaintiff's ID from

his vehicle did not constitute a full-on search, but the Court can see no legal distinction between

entering a vehicle to find one item and entering a vehicle to search it.  *Id.* at 63:21-25.  Officers

never saw any drug activity take place in the car, Chambers admitted that probable cause did not

exist to search the car, and Plaintiff never gave consent to search the car.  *Id.* at 63:18-64:19.  On

this basis, it appears that the officers had no right to enter or search Plaintiff's vehicle for any

purpose.

Defendants, however, maintain that, even though Plaintiff did not expressly give consent to

search his car, his response when asked if he had ID – that it was in his car – "may be reasonably

interpreted as consent to retrieve the identification, which is what an investigating officer did."

(Defs.' Mot. 10:8-10, Dkt. #36.)  Plaintiff argues that the notion that he gave implied consent is not

supported in Defendants' papers, by any case citation, or by any testimony of any involved party.

(Pl.'s Reply 7:22-8:2, Dkt. #39; Pl.'s Opp'n 19:25-20:5, Dkt. #44.)

The Court agrees with Plaintiff.  "The existence of consent to a search is not lightly to be

inferred, and is a question of fact to be determined from the totality of circumstances."  *U.S. v.*

*Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218,

248-49 (1973)).  The party asserting it bears the burden of proving consent, and this burden is

19

heavier where consent is not explicit. *U.S. v. Graham*, 117 F. Supp. 2d 1015, 1020 (W.D. Wash. 2000) (citing *U.S. v. Davis*, 482 F.2d 893, 914 (9th Cir.1973); *U.S. v. Impink*, 728 F.2d 1228, 1232 (9th Cir.1984)).  The law is clear that in the absence of express consent to search, Defendants bear a heavy burden.  The totality of circumstances indicate that the officers asked Plaintiff if he had ID, and Plaintiff  indicated that he did, in his car.  He was not asked to retrieve it, and the officers did not ask if they could retrieve it.  Because Chambers testified that he believed they did not have consent to search Plaintiff's car, they should have also known that they did not have consent to enter the vehicle for any purpose.  Accordingly, Defendants are unable to meet their burden that Plaintiff impliedly consented to the search of his car, and Defendants are not entitled to qualified immunity for that search.  The Court thus DENIES Defendants' motion for summary judgment as to the search of Plaintiff's car.

> 4.   Summary

Based on the foregoing, Defendants are entitled to qualified immunity for the initial detention of Plaintiff.  As to the subsequent chain of events involving the use of the weapon and handcuffs, because the facts are in dispute, Defendants' motion for summary judgment based on qualified immunity is denied.  Regarding the search of Plaintiff's vehicle/retrieval of his ID, because there was not probable cause or consent to search Plaintiff's car, Defendants are not entitled to qualified immunity.

**C.     Plaintiff's Negligence Claim**

In his seventh cause of action, Plaintiff alleges that Chambers failed to comply with the standard of care to be exercised by reasonable police officers to avoid causing unnecessary harm and distress.  (FAC ¶ 42.)  Defendants contend that Plaintiff's allegations and the record itself establish that Chambers' detention of Plaintiff was willful.  (Defs.' Mot. 18:1-3, Dkt. #36.)  Defendants maintain that because negligence and willful conduct (such as deliberately detaining, handcuffing, and inflicting force on an individual) are mutually exclusive, the Court should summarily dismiss Plaintiff's negligence claim.  *Id.* at 17:7-23.

In response, Plaintiff argues that because this cause of action is a theory pled in the

1    alternative and separate and distinct from other claims with different standards of proof, that

2    summary judgment is inappropriate.  (Pl.'s Opp'n 22:15-17, Dkt. #44.)

3         At the November 18, 2010 hearing, counsel for Plaintiff asserted that if the section 1983

4    claim should get dismissed at any point in the proceedings, he should be able to proceed on the

5    negligence claim.  Plaintiff maintained that a jury could find that when Chambers pointed his gun in

6    Plaintiff's direction, it was not an intentional but rather a negligent act.  At this stage, because

7    Plaintiff pleads negligence in the alternative, the Court is hesitant to grant Defendants' motion for

8    summary judgment.  Accordingly DENIES Defendants' motion for summary judgment on this

9    claim.

10   **D.    Plaintiff's Remaining State Law Tort Claims (Except Battery)**

11        Plaintiff alleges Assault and Battery as his fifth cause of action, Intentional Infliction of

12   Emotional Distress ("IIED") as his sixth cause of action, and Negligent Selection, Training,

13   Retention, Supervision, Investigation, and Discipline as his eighth cause of action.  (FAC ¶¶ 35-40,

14   43-48.)

15        Defendants contend that California Government Code section 820.2 and California Penal

16   Code section 847(a)[4] shield Chambers from liability for the actions he took in detaining Plaintiff and

17   searching for his wallet and identification.  (Defs.' Mot. 18:4-8, Dkt. #36.)  Defendants maintain that

18   because Chambers was acting discretionarily, unless Plaintiff can establish that the officers had no

19   reasonable cause to believe the detention or search was lawful, that Chambers is entitled to

20   immunity from Plaintiff's assault, IIED and negligence causes of action.  *Id.* at 18:19-24.

21        In response, Plaintiff contends that Defendants are not entitled to immunity from Plaintiff's

22   claims grounded in excessive force as only basic policy decisions are subject to immunity.  (Pl.'s

23   Opp'n 22:18-23:1, Dkt. #44.)

24        California Government Code section 820.2 provides that "[e]xcept as otherwise provided by

25

26        [4]Defendants' assertions that this section shield them from liability is without merit, as
27   California Penal Code § 847 contemplates immunity from liability for false arrest or false
     imprisonment where there was reasonable cause to believe the arrest was lawful.  Here, Plaintiff
28   does not allege false arrest or false imprisonment.

21

UNITED STATES DISTRICT COURT
For the Northern District of California

1   statute, a public employee is not liable for an injury resulting from his act or omission where the act

2   or omission was the result of the exercise of the discretion vested in him, whether or not such

3   discretion be abused." Similarly, California Government Code section 820.4 provides that "[a]

4   public employee is not liable for his act or omission, exercising due care, in the execution or

5   enforcement of any law."

6        However, in *Blankenhorn v. City of Orange*, 485 F.3d 463, 486 (9th Cir. 2007), the plaintiff

7   alleged assault and battery, negligence, and intentional infliction of emotional distress, along with 42

8   U.S.C. § 1983 claims. The court held that because the plaintiff's state-law claims arose out of

9   excessive force claims, the officers were not entitled to immunity under section 820.2. *Id.* at 487.

10  Accordingly, while Defendants are not moving for summary judgment on Plaintiff's excessive force

11  claims, because Plaintiff's assault, negligence, and IIED claims arise out of his excessive force

12  allegations, Defendants are not entitled to immunity. The Court thus DENIES Defendants' motion

13  for summary judgment on Plaintiff's state law tort claims.

14  **E.      Plaintiff's Eighth Cause of Action**

15       Defendants further argue that summary judgment is proper as to Plaintiff's eighth cause of

16  action — for Negligent Selection, Training, Retention, Supervision, Investigation, and Discipline —

17  because it is one that does not exist under California law. (Defs.' Mot. 19:18-19, Dkt. #36; FAC ¶¶

18  43-48.) Defendants maintain that where an employee was acting within the course and scope of his

19  or her employment, as here, a claim for negligence against the employer is improper. (Defs.' Mot.

20  20:14-22, Dkt. #36.) Defendants also argue that California Government Code § 820.2 shields CCSF

21  from liability for its discretionary decisions in connection with hiring, training, and disciplining

22  Chambers. *Id.* at 20:23-26. Defendants assert that this cause of action is superfluous because if

23  there is a finding that Chambers violated Plaintiff's constitutional rights, CCSF will be liable under

24  the doctrine of respondeat superior. *Id.* at 21:2-6.

25       Plaintiff offers no direct argument in response.

26       The Court agrees with Defendants assertion that this cause of action is superfluous. Though

27  the allegations in *Jeld-Wen, Inc. v. Superior Court*, 131 Cal. App. 4th 853, 866 (2005) concerned

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  negligent entrustment of a vehicle, the court's reasoning is instructive: "Once the employer

2  admittedly becomes vicariously liable for the negligent acts of the employee, there is no remaining

3  basis at a future trial to attempt to prove the negligence of the employer itself, such as through

4  knowledge of the employee's prior accidents, because the subject liability has already been

5  adequately and completely established." *Id.*

6         Accordingly, and as put forth by Defendants, "[t]he City's state-law liability . . . will be

7  determined one way or the other by the jury's finding on the officer's conduct." (Defs.' Mot. 20:16-

8  16, Dkt. #36.)  Thus, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's

9  eighth cause of action.  Plaintiff's attempts to hold CCSF liable for the conduct of its officers

10  remains unaffected.

11  **F.     Respondeat Superior**

12        Next, Defendants contend that Plaintiff's ninth cause of action for respondeat superior

13  against CCSF is not a proper cause of action.  (Defs.' Mot. 21:7-10, Dkt. #36.)   In response,

14  Plaintiff contends that this cause of action is a valid basis for a negligence claim against CCSF if

15  Chambers is held to have been negligent.  (Pl.'s Mot. 23:22-24:1, Dkt. #44.)

16        Although Defendants disagree with the manner in which Plaintiff has titled this cause of

17  action, the Court reads "respondeat superior" to be synonymous with "vicarious liability."  Black's

18  Law Dictionary defines respondeat superior as "[t]he doctrine holding an employer or principal

19  liable for the employee's or agent's wrongful acts committed within the scope of employment or

20  agency."  BLACK'S LAW DICTIONARY 1426 (9th ed. 2009).  Similarly, the definition for vicarious

21  liability — "[l]iability that a supervisory party (such as an employer) bears for the actionable

22  conduct of a subordinate or associate (such as an employee) based on the relationship between the

23  two parties[]" — instructs the reader to consult the definition for respondeat superior.  *Id.* at 998.

24  California Government Code section 815.2(a) provides that "[a] public entity is liable for injury

25  proximately caused by an act or omission of an employee of the public entity within the scope of his

26  employment if the act or omission would, apart from this section, have given rise to a cause of action

27  against that employee or his personal representative."  "This provision clearly allows for vicarious

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  liability of a public entity when one of its police officers uses excessive force in making an arrest."

2  *Blankenhorn*, 485 F.3d at 488.

3      Accordingly, Plaintiff is entitled to sue CCSF for vicarious liability under California

4  Government Code section 815.2(a) and the Court thus DENIES Defendants' motion for summary

5  judgment on Plaintiff's ninth cause of action.

6  **G.     Plaintiff's State Law Discrimination Claim**

7      In his fourth cause of action, Plaintiff alleges that Chambers violated California Civil Code §

8  51.7 because his actions against Plaintiff were motivated by racial prejudice.  (FAC ¶¶ 31-34.)

9  Defendants argue that this allegation is without factual or evidentiary basis because Plaintiff has not

10  offered evidence of any discriminatory intent, as required by the statute.  (Defs.' Mot. 18:27-19:4,

11  Dkt. #36.)  In response, Plaintiff argues that he attached a photograph of himself which shows that

12  he could readily be mistaken for a person of Hispanic origin.  (Pl.s' Opp'n 23:17-21, Dkt. #44.)

13  Plaintiff contends that a jury could readily conclude that Chambers acted on discriminatory

14  assumptions about him, as the incident occurred in the Mission District.  *Id.*

15      California Civil Code § 51.7(a) provides that all persons have the right to be free from any

16  violence, or intimidation by threat of violence, committed against their persons based upon a

17  protected characteristic.  In reviewing a matter on summary judgment, a court must determine

18  whether the moving party has shown that there is an absence of evidence supporting the nonmoving

19  party's case.  *Cline*, 200 F.3d at 1229.  Once the moving party established its burden, the nonmoving

20  party must identify facts which show a genuine issue for trial; otherwise, summary judgment is

21  proper.  *Id.*

22      Plaintiff has not presented any evidence, other than a picture of himself which depicts him as

23  a non-white individual, which would allow the Court to infer that the acts which took place were

24  motivated by Plaintiff's skin color.  At the November 18, 2010 hearing, Defendants alluded to this

25  point.  In response, Plaintiff argued that much had been made of the incident taking place in the

26  Mission District, and that he could be mistaken as Hispanic, although this was admittedly not a

27  "classic race case."  This argument by Plaintiff is insufficient to show that a genuine issue exists for

28

24

1  trial and, accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's

2  fourth cause of action.

3  **H.    Plaintiff's *Monell* Claim**

4          Next, Defendants contend that they are entitled to partial summary judgment on Plaintiff's

5  *Monell* claim as it pertains to the detention and search for Plaintiff's ID.  (Defs.' mot. 19:5-14, Dkt.

6  #36.)  Defendants argue that CCSF cannot be liable for an unconstitutional policy or practice

7  because there is no underlying constitutional violation.  *Id.*

8          In response, Plaintiff contends that because Defendants should not prevail on any of its

9  theories, this argument must fail.  (Pl.'s Opp'n 24:11-13, Dkt. #44.)

10         Because the Court previously found that Defendants are not entitled to qualified immunity

11 with respect to the use of the weapon and handcuffs as well as the ID search, and because there are

12 material facts in dispute, summary judgment is inappropriate as to Plaintiff's *Monell* claim.

13 Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiff's *Monell*

14 claim.

15 **I.    Plaintiff's Bane Act Claim**

16         Finally, in his tenth cause of action, Plaintiff alleges that Defendants violated California Civil

17 Code § 52.1 (the "Bane Act") because Chambers' use of excessive force interfered with Plaintiff's

18 exercise and enjoyment of his civil rights.  (FAC ¶¶ 52-55.)  Defendants contend that section 52.1

19 only governs when a defendant intends by his or her conduct to interfere with a separate state or

20 federal constitutional right, beyond the right to be free from force.  (Defs.' Mot. 21:11-21, Dkt. #36.)

21 Defendants maintain that even if Plaintiff had stated a Bane Act claim, Chambers is immune based

22 on the arguments asserted in the previous section.  *Id.* at 22:2-7.

23         In response, Plaintiff asserts that questions of fact preclude summary judgment on this claim,

24 but he does not respond to Defendants' arguments regarding alleging a separate right.  (Pl.'s Opp'n

25 24:2-10, Dkt. #44.)

26         Conduct by a government actor is actionable under section 52.1 when there is an "attempted

27 or completed act of interference with a legal right, accompanied by a form of coercion."  *Jones v.*

28

25

*Kmart Corp.* 17 Cal. 4th 329, 334 (1998).  Interfering with a person's legal right to be free from unreasonable search or seizure falls under such contemplated conduct.  *Id.*  Where interference with the above right may have been accompanied by the use of excessive force, summary judgment is inappropriate.  *Hwang v. City and County of San Francisco*, No. C-07-2718 MMC,  2008 WL 4279686, at *4 (N.D. Cal. September 15, 2008).

The Court agrees with Plaintiff that questions of fact preclude summary judgment on this claim.  If Defendants are found to have used excessive force, Plaintiff has a viable section 52.1 cause of action.  Accordingly, the Court DENIES Defendants' motion for summary judgment on Plaintiff's Bane Act claim.

## IV.  CONCLUSION

Based upon the foregoing, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for partial summary judgment, as follows:

(1) GRANTS Defendants' motion for partial summary judgment based on qualified immunity as to the initial detention but DENIES Defendants' motion as to the use of the weapon and handcuffs as well as the search for Plaintiff's ID;

(2) DENIES Defendants' motion for partial summary judgment on Plaintiff's negligence claim, state law tort claims, respondeat superior claim, *Monell* claim, and Bane Act claim; and

(3) GRANTS Defendants' motion for partial summary judgment on Plaintiff's negligent selection, training, retention, supervision, investigation, and discipline claim, and Plaintiff's section 51.7 claim.

The Court finds that Plaintiff's motion is moot.

**IT IS SO ORDERED.**

Dated: January 7, 2011                                    _____

Maria-Elena James
Chief United States Magistrate Judge

26